UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

J. RETTENMAIER USA LP,

                Plaintiff,                              Case No. 1:08-cv-575

v.                                          HON. JANET T. NEFF

JON BODNER, SWEETENER SUPPLY
CORPORATION, JOE GARDELLA,
MARK RIESENBERG, and DAN
RIESENBERG,

                Defendants.

_____/

**OPINION**

This is an action filed by plaintiff J. Rettenmaier USA LP against Jon Bodner, its former

employee; Sweetener Supply Corporation, its former distributor; and Sweetener executives Joe

Gardella, Mark Riesenberg, and Dan Risenberg.  Plaintiff originally filed the action on June 16,

2008 in the Kalamazoo County, Michigan, Circuit Court.  Contemporaneously with the filing of its

Verified Complaint, plaintiff filed a Motion for a Temporary Restraining Order, Preliminary

Injunction, and Order to Show Cause.  On June 17, 2008, before the state court acted on plaintiff's

motion, defendants removed the action to this Court.

Following removal, on June 20, 2008, this Court issued a Temporary Restraining Order and

an Order to Show Cause why a preliminary injunction should not issue (Dkt 7).  The Court heard

oral argument on June 25, 2008 and ordered the parties to provide by June 30, 2008 their respective

proposed findings of fact and conclusions of law as well as any supporting documentary evidence.

The Court took the Motion for a Preliminary Injunction under advisement to more fully consider the parties' submissions.  To that end, the Court also extended the Temporary Restraining Order (Dkt 15).

Plaintiff has since timely filed its proposed findings of fact and conclusions of law and four affidavits from its employees with supporting exhibits (Dkts 30-34).  Defendants also timely filed their proposed findings of fact and conclusions of law (Dkt 46).  Additionally, defendants filed a response to plaintiff's Motion for a Temporary Restraining Order, Preliminary Injunction, and Order to Show Cause (Dkt 39).  In support of the response, defendants included five declarations and a compendium of public domain reference sources (Dkts 48-53).

Upon review of the Verified Complaint and attached exhibits, the argument presented in open court, and the briefing and exhibits of the parties, the Court grants plaintiff's motion and continues the temporary restraining order as a preliminary injunction pending adjudication of the merits of this case or further order of the Court.

## I.

Plaintiff manufactures "multi-function dietary cellulose fibers" used as additives or filler agents by manufacturers of pet food and human food.  Compl. ¶¶ 10-11.  According to plaintiff's counsel at oral argument, plaintiff is the United States presence for J. Rettenmaier & Söhne GmbH+Co, a worldwide company established in Germany more than 100 years ago.  Plaintiff began its United States operation in 1997, opening a sales office and building a manufacturing facility in Schoolcraft, Michigan.  *Id.* ¶ 2.  Plaintiff restricts access to its manufacturing facility and mandates visitors to sign non-disclosure agreements to maintain the secrecy of its operations.  Pl. Proposed Findings, ¶¶ 10-12.

Two key products plaintiff manufactures are cellulose powder and approximately 140 cellulose powder blends, which plaintiff manufactures depending on the specifications of the food company-purchasers.  Plaintiff sells its products directly to food companies ("House Accounts") and indirectly to food companies with the help of distributors ("Distributor Accounts").  Pl. Proposed Findings, ¶ 14; Excl. Fiber Distrib. Agrmt. [Exh. 8 to Goss Aff.], ¶ 3.4.

Since 1990, defendant Sweetener, an Illinois corporation, has been in the business of warehousing and distributing ingredients to food companies. Df. Proposed Findings, ¶ 1. Sweetener became one of plaintiff's five distributors when the parties entered into an Exclusive Fiber Distributor Agreement on October 10, 1997.  In fact, plaintiff claims that from 2003 through 2007, Sweetener was plaintiff's largest distributor, accounting for more than 50 percent of plaintiff's total sales in the United States. *Id.* ¶ 35.

The Exclusive Fiber Distributor Agreement charged Sweetener with promptly reporting to plaintiff all customer complaints and with "cooperat[ing] with  the Manufacturer [plaintiff] in the appropriate handling of such complaints with the intent of achieving customer satisfaction." Excl. Fiber Distrib. Agrmt., ¶ 4.3.  Plaintiff, in turn, was mandated to "furnish technical and sales information, if available, to Distributor [Sweetener] to assist Distributor's promotion and sale of Products." *Id.* ¶ 4.5.

The Agreement therefore also provided that Sweetener would take "all reasonable steps to keep in confidence during the term of this Agreement *or thereafter* any and all technical information relating to the Products disclosed to Distributor in confidence by Manufacturer and not previously made public and will use such information solely in fulfilling the purposes of this Agreement." Excl. Fiber Distrib. Agrmt. ¶ 4.5 (emphasis added).  Moreover, their agreement provided that each

party would "conduct itself in a manner which shall protect and promote the other's goodwill and reputation and shall avoid any activity detrimental to the goodwill or reputation of the other." *Id.* ¶ 4.6.

Sweetener acted as an independent contractor.  Excl. Fiber Distrib. Agrmt., ¶ 5.  Plaintiff described the parties' typical course of dealing as the following:  (1) Sweetener would order and purchase a product from plaintiff, (2) plaintiff would manufacture the product to the specifications of the food company, and (3) plaintiff would ship the product to the food company.  Pl. Proposed Findings, ¶¶ 14-15.  Defendants similarly represent that food companies developed product specifications that they gave to Sweetener and Sweetener passed the specifications to plaintiff along with any advice as to how the blending process should occur.  Df. Proposed Findings, ¶ 7; Gardella Decl. ¶ 9.  Plaintiff asserts that it engaged Sweetener to solicit and service the food companies that purchase cellulose products and that its employees worked closely with Sweetener in its efforts.  Pl. Proposed Findings, ¶¶ 11, 15.

One such "key" employee of plaintiff's was defendant Jon Bodner.  Bodner's employment with plaintiff began on October 1, 1999.  Pl. Proposed Findings, ¶ 23; 10/13/1999 Empl. Agrmt. [Exh. 4 to Goss Aff.], ¶ 2.  Within days of his start date, Bodner signed two agreements pertinent to this action.  First, on October 6, 1999, Bodner signed a Confidentiality and Noncompetition Agreement, which provided in pertinent part the following:

> 1.      I will not at any time, either during or after my employment with Employer, use or disclose to others any trade secrets or other confidential information about Employer's business or any of its proprietary rights, except as required in the ordinary course of performing my employment duties for Employer.

* * *

4

5.      During my employment with employer and for a period of two years after termination of my employment with Employer for any reason, I shall not, directly or indirectly, either as an equity owner (except for the ownership of stock in any corporation whose stock is listed on the New York or American Stock Exchange), employee, salesperson, consultant, director, lender, or in any other capacity, engage in or be interested in any business that competes with the business of Employer in the locations in which it conducts business.

6.      During or after my employment with Employer I shall not take any action that will cause the termination of the business relationship between Employer and any customer or supplier of Employer.  I also shall not solicit for employment any person employed in Employer's business including employees of distributors of Employer's products.

On October 13, 1999, Bodner signed an Employment Agreement, which also addressed

confidentiality and provided the following:

A.      Employee agrees that he will not, except as required in the conduct of Employer's business or as authorized in writing by Employer, publish or disclose to any person, firm or corporation during Employee's term of employment or at any time thereafter, any trade secret or confidential information concerning any invention or other matter relating to Employer's business that Employee may in any way acquire by reason of his employment by Employer.

B.      Employee further promises and agrees not to engage in competition with Employer, at any time during or after the termination of this Agreement, while making use of Employer's confidential information or trade secrets. The parties stipulate that the same are important, material, and confidential, and gravely affect the effective and successful conduct of the Employer's business and its goodwill and that any breach of the terms of this subparagraph is a material breach of the Agreement.

C.      For a period of two years immediately following the termination of his employment with Employer, Employee shall not call on, solicit, or take away any of the customers of Employer on whom Employee called or with whom Employee became acquainted or aware of during his employment with Employer, either for himself or for any other person, firm, or corporation.

Bodner held several positions in plaintiff's food division over the years.  On January 1, 2001,

Bodner was promoted to the position of senior manager of sales and marketing/applications and

5

market development.   Pl. Proposed Findings, ¶ 26.   In this position, Bodner had overall responsibility for product development and applications, plaintiff's sales force, customer relations, and sales and marketing strategies.   *Id.*   Plaintiff represents that Bodner had "virtually unlimited access" to its confidential information and trade secrets.   *Id.* ¶ 27.

One of Bodner's specific job duties was to "cooperate with Manufacturing and [Quality Assurance] on the development of appropriate specifications to meet customer requirements."   Exh. 6 to Goss Aff.   At oral argument, plaintiff's counsel described Bodner as a "problem-solver" and "troubleshooter" for Rettenmaier product purchasers.   For example, Bodner and a representative from Sweetener met with a food company in Wisconsin to work out the company's equipment issues.   Exh. 7 to Goss Aff.   Plaintiff's director of administration and controlling attested that there are "few, if any other individuals at Rettenmaier who have the level of detailed and in-depth knowledge of Rettenmaier's manufacturing processes, Rettenmaier's products, Rettenmaier's customers, and Rettenmaier's business operations than Bodner."   Goss Aff. ¶ 25.

Defendant Gardella is the Executive Vice President of Sweetener.   Compl. ¶ 5.   Defendants Dan and Mark Riesenberg are Sweetener's vice presidents of sales and marketing.   *Id.* ¶ 5.   Plaintiff alleges that all three Sweetener executives were privy to plaintiff's technical and sales information, customer and sales data, sales and marketing strategies, and quality control information because of the long and close relationship between the two companies.   Pl. Proposed Findings, ¶ 36.   The Sweetener executives signed "Non-Disclosure of Confidential Information" agreements in May 2002 concerning the Rettenmaier information to which they were privy, promising "at all times to hold such information in the strictest confidence."   Exhs. 9-11 to Goss Aff.; Pl. Proposed Findings, ¶ 29; Df. Proposed Findings, ¶¶ 45-46.

In June 2006, defendant Gardella met with an engineer to discuss designing and building its own cellulose fiber milling and packaging system within Sweetener's business facility.  Bernard Decl. ¶ 5; Df. Proposed Findings, ¶ 13.  Sweetener received a plan and preliminary cost estimate from the engineer in September 2006.  *Id.* ¶ 14.

On November 16, 2006, plaintiff sent Sweetener a letter referencing earlier discussions between the parties and the parties' mutual agreement that the Exclusive Fiber Agreement had become "out-dated due to market developments."  Exh. 12 to Goss Aff.  Plaintiff indicated that the current agreement would terminate effective February 16, 2007.  *Id.*  Plaintiff further indicated that the "parties reached the agreement that their future cooperation shall be governed by a new agreement," and, to that end, the parties would meet again with the goal of defining clear arrangement about customer responsibilities.  *Id.*

Following receipt of the November 16, 2006 letter, defendants instructed their engineer to move forward "as quickly as possible" with the installation of the milling system he designed.  Df. Proposed Findings, ¶ 16.  Further, according to plaintiff's counsel at oral argument, Sweetener stopped paying plaintiff's invoices in March 2007.  Plaintiff claims that Sweetener owes it approximately $2.6 million.[1]

On May 14, 2007, Sweetener filed a petition to register a trademark for the word "Ridgeland" to use in commerce to identify its food additive.  Exh. 17 to Goss Aff.  Defendants opine that it is their understanding that "pursuant to the express terms of the parties' prior Exclusive

---

[1] The parties' dispute over these revenue payments is the subject of a separate action in this Court, *J. Rettenmaier USA LP v. Sweetener Supply Corp.,* No. 1:08-cv-592.

Fiber Distributor Agreement, it has been free to compete with Rettenmaier in the milling and sale of cellulose fiber since May 17, 2007." Df. Proposed Findings, ¶ 37.

Sweetener's milling system was functioning by late December 2007, albeit at a limited capacity. Df. Proposed Findings, ¶¶ 1, 19, 28. Sweetener packaged and sold its product under the brand name "Ridgeland Fibers." *Id.* ¶ 38.

In February 2008, after Sweetener's new milling system was operating at a greater capacity, Sweetener contacted Bodner about working for Sweetener as its Director of Purchasing, and Bodner accepted Sweetener's offer. Df. Proposed Findings, ¶¶ 29, 32-33. Bodner submitted a notice of his resignation to plaintiff but was not forthcoming to persons at Rettenmaier about his future employment intentions. Pl. Proposed Findings, ¶ 38.

On March 4, 2008, plaintiff's General Manager, Thorsten Willmann, sent Mark Riesenberg an e-mail titled "further proceedings with JRS USA," expressing his disappointment that he could not reach Riesenberg to discuss an agreement or formal contract between the parties. Exh. 13 to Goss Aff. Willmann wrote, "How do you expect us to work together if we do not even talk on the phone?" *Id.*

On April 29, 2008, after plaintiff learned of and confirmed Bodner's employment with Sweetener, counsel for plaintiff wrote Bodner, reminding him of his obligations to plaintiff under their contracts and the Uniform Trade Secrets Act. Exh. 14 to Goss Aff. Plaintiff's counsel advised Bodner that plaintiff was prepared to take immediate legal action to secure injunctive relief and monetary damages in the event Bodner individually or in concert with Sweetener conspired to violate their obligations. *Id.*

Counsel for Sweetener replied May 8, 2008, opining that Bodner's October 6, 1999 agreement was superseded by the October 13, 1999 agreement and that Bodner was not in violation of the latter inasmuch as Bodner is "only using information that is generally available to the public or was acquired by him outside of his employment with JR USA." Exh. 15 to Goss Aff.

On June 9, 2008, Sweetener's website indicated that the company was a "proud Exclusive Distributor of Rettenmaier Fiber products." Exh. 16 to Goss Aff. The director of plaintiff's sales division attests that on June 11, 2008, he learned that a customer that had previously been receiving bags of Rettenmaier Fibers instead began receiving bags in February 2008 labeled "Ridgeland Fibers." Rath Aff. ¶ 5; Exh. 18 to Goss Aff. The sales division director attests that a representative for the customer was advised by a Sweetener salesperson that the two cellulose products were the "same." *Id.* Plaintiff's materials manager attests that its bag supplier is supplying Sweetener with the same size bags that plaintiff uses. Jaros Aff. ¶ 3. Two other Rettenmaier executives attest that they also learned in the first week of June 2008 about two customers that previously purchased Rettenmaier Fibers that had been contacted by Sweetener about instead purchasing Ridgeland Fibers at a lower price. Michel Aff. ¶ 4; Rath Aff. ¶ 6.

Defendants assert that Sweetener has only sold its product to "Sweetener customers who had previously purchased Rettenmaier product from Sweetener as one of our 'Distributor Accounts'" and not to any customers that had previously been designated as "House Accounts." Df. Proposed Findings, ¶¶ 39-40.

Per the representations of counsel at oral argument, plaintiff terminated its relationship with defendant on June 12, 2008. As of June 23, 2008, Sweetener's website indicated that it was now

9

a "Manufacturer and Distributor of Ridgeland$_{sm}$ Fiber products."  Exh. 16 to Goss Aff.  Plaintiff filed this action one week later.

II.

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981).  Given this limited purpose, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."  *Id.* Accordingly, a party "is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits."  *Id.*

Federal Rule of Civil Procedure 65, which governs the issuance of preliminary injunctions, does not explicitly require the court to conduct an evidentiary hearing before issuing an injunction. FED. R. CIV. P. 56(a)(1).  The Sixth Circuit has held that an evidentiary hearing is only required when there is a disputed factual issue and the documentary evidence upon which to base an informed, albeit preliminary, conclusion is inadequate.  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,* 511 F.3d 535, 552 (6th Cir. 2007); *S.E.C. v. G. Weeks Sec., Inc.,* 678 F.2d 649, 651 (6th Cir. 1982).

Courts consider the same four factors in deciding whether to issue a temporary restraining order or a preliminary injunction.  *Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell,* 467 F.3d 999, 1009 (6th Cir. 2006).  In *Mason County Med. Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir. 1977), the Sixth Circuit enunciated these four factors as the following:

10

1.      whether the movant has a strong likelihood of success on the merits,

2.      whether the movant would suffer irreparable injury absent an injunction,

3.      whether the issuance of an injunction would cause substantial harm to others, and

4.      whether the public interest would be served by issuing an injunction.

"These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Ne. Ohio,* 467 F.3d at 1009, quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 153 (6th Cir. 1991).

As the party seeking the injunctive relief, plaintiff bears the burden of persuasion on each of these factors. *American Standard, Inc. v. Meehan,* 517 F. Supp. 2d 976, 982 (N.D. Ohio, 2007), citing *Stenberg v. Cheker Oil Co.,* 573 F.2d 921, 925 (6th Cir. 1978).

A.      Likelihood of Success on the Merits

In *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985), the Sixth Circuit acknowledged that it had not consistently applied the likelihood of success factor.  However, the Sixth Circuit opined that the varying language in its cases could "best be reconciled" by recognizing that the four considerations are factors to be balanced and that the degree of likelihood of success required may depend on the strength of the other factors.  *Id.*  Specifically, the Court emphasized that "the likelihood of success that need be shown will vary inversely with the degree of injury the plaintiff will suffer absent an injunction." *Id.*

In *Certified Restoration,* the Sixth Circuit pronounced that "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."  511 F.3d at 543 (citing *DeLorean,* 755 F.2d at 1229).  Similarly, Wright and Miller opine that "when grave harm is

11

threatened, the applicant need show only that its claims provide a *fair ground* for litigation."  11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE CIVIL § 2951 (2d ed. 2007) (emphasis added).

In its complaint, plaintiff raises six grounds for relief:  Breach of Contract against Bodner arising from Bodner's Employment Agreement and his Confidentiality and Noncompetition Agreement (Count 1); Breach of Contract against Gardella and the Riesenbergs arising from their Non-Disclosure of Confidential Information agreements (Count 2); Misappropriation of Trade Secrets Against All Defendants (Count 3); Tortious Interference with Contract/Prospective Business Relationships (Counts 4 & 5); and Unfair Competition (Count 6).

Plaintiff's brief in support of its requested injunctive relief addresses the merits of its breach of contract claims against Bodner and the Sweetener defendants (Counts 1 & 2) and its misappropriation of trade secrets claim (Count 3), which are the claims giving rise to the requested injunctive relief.  This Court applies its own procedural jurisprudence regarding the factors to consider in granting a preliminary injunction and applies Michigan law to determine whether plaintiff has met this first factor on the likelihood of its success on the merits.  *Certified Restoration,* 511 F.3d at 541.  The Court finds that the parties presented sufficient documentary evidence upon which to base an informed, albeit preliminary, conclusion on these counts.

Turning first to Count 1, an employer in Michigan may obtain from an employee an agreement that protects the employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment "if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business."  MICH. COMP. LAWS § 445.774a(1).  "The burden of

12

demonstrating the validity of the agreement is on the party seeking enforcement." *Coates v. Bastian Brothers, Inc.,* 741 N.W.2d 539, 545 (Mich. Ct. App. 2007), lv. den. 747 N.W.2d 545 (Mich. 2008).

Although defendants argue that Bodner's October 13, 1999 Employment Agreement superseded the October 6, 1999 Confidentiality and Noncompetition Agreement, defendants do not dispute the reasonableness of the non-competition clause in the October 13, 1999 employment agreement. As quoted above, the October 13, 1999 Employment Agreement prohibits Bodner from unauthorized disclosure of any trade secret or other confidential information about plaintiff's business during the term of his employment "*or* at any time thereafter." The agreement further prohibits Bodner from engaging in competition with plaintiff "at any time during *or* after the termination of this Agreement, while making use of Employer's confidential information or trade secrets." Last, the agreement prohibits Bodner from calling on or soliciting "any of the customers of Employer on whom Employee called *or* with whom Employee became acquainted or aware of during his employment with Employer, either for himself or for any other person, firm or corporation."

According to plaintiff, Bodner was privy to extensive knowledge of its manufacturing and production operations, product development, customers, sales and marketing, and sources of supply and pricing. Pl. Proposed Conclusions, ¶ 22. Plaintiff identifies the confidential information and trade secrets as the following:

- Rettenmaier's manufacturing operations and processes, including the type of equipment that Rettenmaier utilizes, the sources of the equipment, and the prices that Rettenmaier paid for the equipment, through put data and quality control data used in the manufacture of Rettenmaier Fibers;

- Information relating to the production of Rettenmaier's ten different kinds of powdered cellulose, including Rettenmaier's sources of

13

supply and prices paid for raw materials, information relating to the specific manufacturing processes regarding the production of each kind of powdered cellulose, and information relating to the uses, applications, functionality, and performance of each of the different kinds of powdered cellulose;

- Information relating to the approximately 140 different kinds of cellulose blends that are manufactured by Rettenmaier, including information as to how each of the blends are produced, the ingredients and formulas utilized in producing each of these blends, and information relating to the functionality, performance, and application of each of these blends;

- Information relating to Rettenmaier's sources of supply and prices it paid for raw materials;

- Information relating to Rettenmaier's customers, including customer identities, key contacts, addresses, products purchased by each customer, prices charged to each customer, profit margins that Rettenmaier was able to realize on any particular customer account, specific needs and requirements of the customer, buying habits, and sales and marketing strategies; and

- Technical information relating to Rettenmaier products, including research and development information with respect to how a particular product has been developed for Rettenmaier's customers, comparative data with respect to how Rettenmaier products compare with competitors' products, and application data which relates to the functionality and performance of Rettenmaier products.   [Pl. Proposed Conclusions, ¶ 23]

Plaintiff argues that the timing of Sweetener's hire of its key employee is not coincidental but indicates that Sweetener intended to take advantage of Bodner's extensive knowledge of plaintiff's business operations in order to provide Sweetener with an unfair advantage in its efforts to compete with plaintiff. *Id.,* ¶ 27.

Again, defendants do not argue that the non-competition provision is unreasonable; instead, they argue that the provision is inapplicable because (1) plaintiff's milling process and its specifications for cellulose fiber or anti-caking blends are matters that are in the public domain and

14

therefore cannot be deemed to constitute protectable trade secrets, and (2) Bodner's job responsibilities with Sweetener are limited to purchasing raw materials, the price of which is in the public domain.  Df. Proposed Conclusions, ¶ 3.  Defendants also argue that to the extent Bodner has contact with customers, his customer contact is limited to contacts with "customers of Sweetener." *Id.*

Because Bodner's Employment Agreement prohibits him from calling on or soliciting not only customers on whom Rettenmaier called but also customers with whom he became "acquainted" or "aware of" during his employment with plaintiff, the Court finds inconsequential defendants' repeated attempts to distinguish between Rettenmaier customers ("House Accounts") and Sweetener customers ("Distributor Accounts").

Indeed, Bodner agreed in his Employment Agreement that "customers" would be broadly defined as "any and all persons, partnerships, corporations, firms or other entit[ies] who order or have ordered products or services from the Employer as [a] result of solicitations conducted by persons or entities engaged by or representing the Employer's business, whether as an employee, agent, independent supplier, or otherwise, notwithstanding that such persons, partnerships, corporations, forms or other entities may have been induced to become customers to give their patronage to the Employer by the efforts and solicitations of the Employee, or of someone on the Employee's behalf, regardless of the time of solicitation."  Empl. Agrmt., ¶ 12D.

Regarding defendants' public domain arguments, plaintiff agrees that as a general proposition, the milling process itself is not confidential; however, plaintiff asserts that some aspects of the process, such as the type of milling equipment, pricing information, and throughput data, *is* confidential.  Pl. Proposed Findings, ¶ 16.  Additionally, plaintiff's director of administration and

controlling asserts that even if Bodner is only involved in purchasing products available on the open market, as Sweetener claims, Bodner is still "using or is likely to use Rettenmaier's confidential information [inasmuch as] Bodner knows Rettenmaier's sources of supply and the prices that Rettenmaier paid for product it purchased."  Goss Aff. ¶ 42.  The affiant points out that "Bodner is able to use this information as a benchmark and as a basis for negotiating prices for Sweetener." *Id.*

The Court finds that plaintiff's allegations raise questions going to the merits that are "so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."  *See Certified Restoration,* 511 F.3d 543.  Plaintiff has therefore borne its burden of proving a substantial likelihood of succeeding on Count 1.

Similarly, plaintiff has borne its burden of persuasion on the likelihood of succeeding on its breach of contract claim in Count 2, which arises from the confidentiality provision of the Exclusive Fiber Distributor Agreement and the individual Non-Disclosure of Confidential Information agreements.  Plaintiff asserts that over the course of its relationship with Sweetener and its executives, plaintiff disclosed the following confidential information to defendants:

- Technical and sales information relating to Rettenmaier products.  This information included application data, which includes information on the function and performance of various products that Sweetener sold to customers on behalf of Rettenmaier.

- Customer and sales data, including the identities, addresses, and names of key customer contacts; products purchased by customers; prices that Rettenmaier charged for each product; and volume of product purchased by each customer.

- Sales and marketing strategies, which included what specific features about particular products to promote, recommendations to customers to reduce prices, and pricing strategies.

16

- Quality control information which included information and data generated to demonstrate the quality and consistency of various products sold to customers.

- Information relating to new products and new developments that Rettenmaier was launching, including information on how those products performed and who was purchasing those products. [Pl. Proposed Conclusions, ¶ 34]

Plaintiff asserts that Sweetener, in violation of the confidentiality agreements, is using or is likely to use the above confidential information to which it has been privy to unfairly compete with Rettenmaier. *Id.* ¶ 36.

Defendants proffer the same public domain argument as in Count 1, Df. Proposed Conclusions, ¶ 4, an argument that again fails to encompass the breadth of confidential information plaintiff alleges has been improperly used to unfairly compete with Rettenmaier. Defendants also make the same unconvincing attempt to distinguish between Rettenmaier customers ("House Accounts") and Sweetener customers ("Distributor Accounts"). Df. Proposed Conclusions, ¶ 4. As with Count 1, the Court finds that plaintiff's allegations in Count 2 raise questions going to the merits that are "so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *See Certified Restoration,* 511 F.3d 543.

Last, turning to plaintiff's Count 3 under the Uniform Trade Secrets Act (UTSA), the UTSA instructs that "[a]ctual or threatened misappropriation may be enjoined." MICH. COMP. LAWS § 445.1903. The UTSA defines "misappropriation" as either of the following:

(i)    Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(ii)   Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:

(A)    Used improper means to acquire knowledge of the trade secret.

17

(B)     At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.

(C)     Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.  [MICH. COMP. LAWS § 445.1902(b)]

"Trade secret," in turn, is defined as "[i]nformation, including a formula, pattern, compilation, program, device, method, technique, or process" that both "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  MICH. COMP. LAWS § 445.1902(d).

In this regard, plaintiff argues that it made reasonable efforts to maintain the secrecy of its operations and that Sweetener and its executives have misappropriated its secret manufacturing processes, product information, and customer list in order to gain an unfair commercial advantage. Pl. Proposed Conclusions, ¶¶ 39-41, 49.  In support of its allegations, plaintiff presented circumstantial evidence that Sweetener has supplied at least one Rettenmaier Fibers purchaser with Ridgeland Fibers and approached two other Rettenmaier Fibers purchasers with proposals to undercut plaintiff's prices.

Defendants do not dispute plaintiff's efforts to keep its operations secret; rather, defendants dispute whether the information plaintiff seeks to protect constitutes trade secrets. Defendants claim

that the specifications for food quality cellulose fiber are available in the public domain, or can be learned from reverse-engineering a particular processed food product, or were provided directly to Sweetener by food companies in the "normal course of business." Df. Proposed Findings, ¶¶ 27, 41-44; Df. Proposed Conclusions, ¶ 5. Further, defendants emphasize that Sweetener's engineer created its milling system without knowledge of or access to plaintiff's milling process and that Bodner was not employed until three months after Sweetener succeeded in milling marketable cellulose fiber. Df. Proposed Conclusions, ¶ 5.

The Court finds that the verified allegations in the complaint and the affidavits plaintiff supplied raise questions going to the merits of its UTSA claim that are a "fair ground for litigation." *See, e.g., Kelly Servs., Inc. v. Noretto,* 495 F. Supp. 2d 645, 658 (E.D. Mich. 2007) ("information such as a brokerage firm's customer lists were trade secrets for the purpose of MUTSA") and *Hayes-Albion v. Kuberski,* 364 N.W.2d 609, 616 (Mich. Ct. App. 1984) ("[s]pecific information regarding resolution of the problems of particular customers is a trade secret"). At the very least, the conduct plaintiff alleges demonstrates a *threatened* misappropriation of trade secrets.

As for defendants' argument that the confidential information was made available to defendants through the "normal course of business," it is the very fact that defendants had access to this information through their employment and distributor relationships with plaintiff – and had agreed not to disclose such information – that places the information under the UTSA. *See Kelly Servs., supra; Raymond James & Assocs., Inc. v. Leonard & Co.,* 411 F. Supp. 2d 689, 696 (E.D. Mich. 2006).

The Court finds that plaintiff has borne its burden of proving a substantial likelihood of succeeding on Count 3.

B.     Irreparable Harm to Plaintiff

The Court finds that absent a preliminary injunction, the harm to plaintiff, an established dietary fiber manufacturer,  is irreparable.   It is well settled in the Sixth Circuit that "[a]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir. 1992).  "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Id.* at 512.  "Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Id; see also Kelly Servs.,* 495 F. Supp. 2d at 659-60.

Defendants' improper  use of plaintiff's trade secrets to start a new manufacturing venture and solicit purchasers of plaintiff's products will result in the eroding if not destruction of plaintiff's competitive role in this market, a role plaintiff opines that it will never be able to regain, regardless of any damages plaintiff attempt to quantify in this suit.  Consequently, plaintiff has satisfied the second factor of the preliminary injunction analysis.

C.     Substantial Harm to Third Party

In consideration of this third factor, defendants claim that if Sweetener is ordered to cease the milling and sale of its cellulose fiber product, then it will lose tens of millions of dollars in sales as well as the goodwill of customers whose needs it will be unable to satisfy.  Df. Proposed Findings, ¶¶ 48-49.

Defendants' fears are misplaced.  The cessation of Sweetener's business is not before the Court.  Rather, as evidenced by the specificity and detail of the Court's Temporary Restraining Order, the Court's intention is for the parties to remain in compliance with the agreements they have

20

negotiated until a trial may be held on the merits of plaintiff's claims.  Indeed, defendants have requested that the substance of any preliminary injunction issued by this Court "mirror the substance of the previously issued Temporary Restraining Order."  Df. Brief in Opposition to Mot. for Prelim. Inj., 14.

D.    Public Interest

Plaintiff argues that the public has an interest in upholding confidentiality agreements, whereas defendants argue that the confidentiality agreements are irrelevant and that the public's interest instead lies in maintaining a competitive marketplace.  Pl. Proposed Conclusions, ¶¶ 53-55; Df. Proposed Conclusions, ¶ 7.  To the extent that this factor tips in either direction, the Court finds that it tips in plaintiff's favor.  *See, e.g., Superior Consulting Co., Inc. v. Walling,* 851 F. Supp. 839, 848 (E.D. Mich. 1994) (pointing out that the Michigan legislature has explicitly endorsed reasonable noncompetition covenants and holding that the public interests in protecting confidential information and enforcing valid employment contracts weighed in favor of issuing the preliminary injunction).

In sum, the balance of the factors weighs in favor of granting a preliminary injunction.

III.

Federal Rule of Civil Procedure 65(d) states that "no restraining order of preliminary injunction shall issue except upon the giving of security by the applicant ...."  FED. R. CIV. P. 65(d). "While ... the language of Rule 65(d) appears to be mandatory, and many circuits have so interpreted it, the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security."  *Moltan Co. v. Eagle-Picher Indus., Inc.,* 55 F.3d 1171, 1176 (6th Cir. 1995) (citing *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 539 (6th Cir. 1978); *Urbain v. Knapp Bos. Mfg. Co.,* 217 F.2d 810, 815-16 (6th Cir. 1954)).  In their written submissions to this

Court, the parties did not identify any purpose that requiring a security would serve.  The Court therefore continues to waive the security requirement of Rule 65(d).

IV.

For the foregoing reasons, plaintiff's Motion for a Preliminary Injunction is GRANTED and the Temporary Restraining Order issued by this Court on June 20, 2008 is hereby continued as a Preliminary Injunction pending an adjudication of the case on its merits or further order of the Court.

An Order consistent with this Opinion shall issue.


DATED: July 9, 2008                          /s/ Janet T. Neff
                                            JANET T. NEFF
                                            United States District Judge